IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 24, 2010

## STATE OF TENNESSEE v. PATRICK WAYNE TRIPP

**Direct Appeal from the Circuit Court for Lincoln County**
**No. S07000133    Robert Crigler, Judge**

_____

**No. M2009-01203-CCA-R3-CD - Filed October 15, 2010**

_____

A Lincoln County jury convicted the Defendant, Patrick Wayne Tripp, of rape of a child, a Class A felony; aggravated child abuse, a Class A felony; aggravated child neglect, a Class A felony; sexual exploitation of a minor, a Class D felony; and attempted incest, a Class D felony. The trial court imposed a total effective sentence of forty-two years in the Tennessee Department of Correction. In this appeal as of right, the Defendant raises four issues: (a) whether the trial court erred when it denied his motion for a judgment of acquittal; (b) whether the evidence at trial was sufficient to support his convictions; (c) whether the trial court committed plain error when it instructed the jury on the offense of rape of a child; and (d) whether the trial court erred when it sentenced the Defendant. After a thorough review of the record and relevant authorities, we conclude the evidence supports the Defendant's convictions, the trial court properly instructed the jury, and the trial court properly sentenced the Defendant. Therefore, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

A. Jackson Dearing, III (at trial), Shelbyville, Tennessee, and Dorothy D. Buck (at trial and on appeal), Fayetteville, Tennessee, for the Appellant, Patrick Wayne Tripp.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Rachel E. Willis, Assistant Attorney General; Charles Crawford, District Attorney General; Michael David Randles and Ann L. Filer, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION

## I. Facts

This case arises from the physical and sexual abuse of a five-year old boy the Defendant believed to be his son. A Lincoln County grand jury indicted the Defendant for rape of a child, aggravated child abuse, aggravated child neglect, sexual exploitation of a minor, and incest. The State later amended count five of the indictment, which charged the Defendant with incest, to charge attempted incest. At the Defendant's trial, the following evidence was presented: Carolyn Couch, a sergeant medical examiner and field training officer with the Lincoln County Sheriff's Department, testified she was on duty the day officers brought the five-year old victim, E.D.[1], to her department. The first thing she noticed about the little boy was that the skin around his lips, which were caked in the corners with a green puss-like substance, was red and swollen. Pictures taken at the Sheriff's Department show blistering inside the boy's upper and lower lips. Sergeant Couch smelled a strong odor of infection on the boy's breath.

Sergeant Couch recalled that, after someone at the sheriff's department gave E.D. food, E.D. dropped a few crumbs on the floor and became very upset. She said he apologized "over and over" until they assured the boy he was not in trouble. A deputy escorted the little boy to the bathroom, and Sergeant Couch saw the little boy wash his hands after he finished. As she was thinking how extraordinary it was for a boy of his age to wash his hands so promptly, E.D. pushed open the door and said, "Look, look," pointing toward his genitalia, which he had exposed by pulling down his pants. Sergeant Couch then saw that E.D.'s genitalia was bruised and swollen. Pictures taken at the Sheriff's Department show deep bruising around E.D.'s genitalia and several red marks on his penis and scrotum where the skin appears to be raw.

On cross-examination, Sergeant Couch said officers brought E.D. to her department between 7:00 a.m. and 7:30 a.m. on April 5, 2007.

C.P. testified she had cared for E.D. at various times in his life and was caring for him at the time of trial. She recalled that in 2000 or 2001 her son came to her house in Union Grove, Alabama, with a pregnant woman who he said was carrying his child. The couple returned in July 2001 and dropped off E.D., who was two weeks old at the time, at C.P.'s house. The couple returned three weeks later and retrieved E.D., only to bring him back to C.P. in early August 2001. E.D. became sick in early September, so his parents took him to

---

[1]Given the nature of the crimes, we will refer to the child victim by his initials, "E.D." We will refer to any individual whose identity could reveal the victim's identity by his or her initials as well.

the hospital, and they took E.D. home with them when the hospital released him. The week before Thanksgiving 2001, E.D.'s mother brought him back to C.P., where he stayed for several years.

C.P. "begged" E.D.'s mother for custody so that she would have legal authority to get medical treatment for E.D., and finally in January 2002 his mother signed a document giving C.P. temporary custody of E.D. C.P. testified that E.D.'s mother had four other children of whom she also did not have custody.

While E.D. lived with C.P. during this time, he became playmates with Dakota, C.P.'s great-nephew, until Dakota's family moved away in September 2006. E.D. remained in C.P.'s custody until January 2007, when E.D.'s mother returned, saying she had decided, though she had no proof, that C.P.'s son was not E.D.'s father. E.D.'s mother told C.P. she was going to take E.D. to live with someone in Tennessee who "could be his daddy." E.D.'s mother said the man lived on a farm with his mother and stepfather, so she believed E.D. would be happy because he would be able to play on the farm. C.P. begged his mother not to take E.D. away, but she took him anyway.

Rather than take E.D. to Tennessee, however, E.D.'s mother tried to give E.D. to her own mother, but her mother refused. E.D.'s mother, therefore, dropped him off with C.P.'s son where he lived with his new girlfriend, Carolyn. C.P. was only able to see E.D. four or five times while he stayed with her son. He remained with C.P.'s son until March 10 or 11, 2007, when E.D's mother picked him up from a ballfield where C.P.'s son was trying to register E.D. to play baseball and took him to her apartment in Huntsville, Alabama.

In April 2007 C.P. learned that E.D. was in Tennessee, and she did not see him again until May 2007. C.P. obtained custody of E.D. when he returned from Tennessee because, after a paternity test ruled her son out as E.D.'s father, Interstate Child Protective Services ("ICPS") determined she was the most eligible person to care for him. ICPS named C.P. as E.D.'s foster mother, a status which requires the completion of parenting classes and periodic home inspections.

E.D. was in therapy at the time of trial, and he had been diagnosed with attention deficit hyper-activity disorder ("ADHD"). C.P. described him as "extremely active" and agreed that he was a "handful." She said that he has trouble conversing and keeping his mind on one track, though he is able to ask for what he wants or needs. C.P. said that, though not part of his attention deficit disorder, E.D. had trouble sleeping. She testified that E.D. called her "Grammy" and that she considered herself to be E.D.'s grandmother.

On cross-examination, C.P. said E.D. was born June 29, 2001. She testified that, after

3

dropping E.D. off with C.P. in November 2001, E.D.'s mother visited her son once every three or four months for about twenty minutes each time. During this time, E.D.'s mother did not financially support E.D. C.P. did not know whether drug or alcohol abuse caused this neglectful behavior.

C.P. recalled that the night before E.D.'s mother took E.D. from the ballfield, Carolyn called asking her to help pay for E.D.'s baseball registration fee. She agreed and delivered the money to Carolyn who then took E.D. to the ballfield and registered him. C.P.'s son planned to tell E.D. on this same day that he was not his father. They planned for both Carolyn and C.P. to be present when he did so. Before this could happen, however, E.D.'s mother and Carolyn argued over who would care for E.D. that night because both females wanted to "go partying" that night. After Carolyn refused, E.D.'s mother took E.D. back to her apartment in Huntsville.

C.P. explained that E.D. began to have seizures when he was ten months old but that these seizures stopped when he was four-and-a-half. She said these seizures, which caused E.D. to lose control of his body and occasionally stop breathing, occurred monthly, sometimes weekly. Though the seizures would last only a short time, his body would be exhausted, so she required him to rest for about twenty-four hours after each seizure. C.P. said that when E.D. was not having a seizure, however, he was "extremely" coordinated and played many sports.

When E.D. was five, physicians said he "possibly" had ADHD, but children under the age of six cannot take ADHD medication. C.P. testified that having temporary custody does not confer enough authority to obtain ADHD treatment for a child, so she called E.D.'s mother to ask for permission to get medical treatment for E.D. This call prompted his mother to return, saying she was going to take E.D. to Tennessee. C.P. testified that, as far as she knew, the first time E.D. received medication for his ADHD was when he returned from Tennessee to live with her. She said she received temporary custody of E.D. in March 2008 and permanent custody of E.D. in January 2009.

C.P. testified that E.D. was a very active child, saying he enjoyed riding his bicycle as well as a small battery-operated motorcycle. C.P. said E.D. did not tend to ride fast on his bicycle because he was afraid of falling. She said he did not fall before he went to Tennessee because his bicycle had training wheels. She said that, since he returned to live with her, he began to "jump" from his bicycle before it came to a complete stop, rather than putting the kick stand down and climbing off of it.

On redirect examination, C.P. clarified that the medication E.D. took for his seizures affected only the duration and severity of his seizures rather than their frequency. She

4

testified that E.D. never developed bruises from any of his seizures and that he was very inactive as a small child. She said that, while he was in her care, he never severely bruised himself from playing or riding a bike.

On recross-examination, C.P. said E.D.'s mother was the one who wanted to tell E.D. that C.P.'s son was not his father. Also, she testified that E.D. did not bite his lips during seizures; he simply stopped breathing. She testified that she and her ex-husband, with whom she lived when E.D. was a small child, watched E.D. "extremely closely."

Ryan Hill, a Lincoln County Sheriff's Department deputy, testified that a phone call from the Defendant's step-father, Harold Enos, prompted him and Deputy David Miller to respond, in separate vehicles, to 182 Mountain Road in Elora, Tennessee. The Defendant lived in the house at this address with his mother and Enos. Deputy Hill seized E.D., who had been living at this house as well, and drove him to the Sheriff's Department. The other deputy transported the Defendant to the station.

As the deputy drove E.D. to the station, E.D. "kept holding himself" and saying that "he hurt down there." Deputy Hill was concerned for E.D. because E.D.'s mouth was swollen and extremely blistered. Upon arriving at the station, they met the station's nurse, Carolyn Couch, in the receiving area. E.D. needed to use the restroom and, feeling very attached to Deputy Hill, asked the deputy to accompany him. While E.D. was using the restroom, he told Deputy Hill to look at his groin area and when the deputy did so, he realized E.D.'s groin area was extremely swollen and bruised. Realizing further investigation was necessary, he handed the matter over to the investigator responsible for child abuse issues, Joyce McConnell.

On cross-examination, Deputy Hill said he had a warrant for the Defendant's arrest before going to the Enos residence. The record does not clearly set forth the basis of this warrant. When Deputies Hill and Miller arrived between 6:15 a.m. and 7:00 a.m., Enos and his wife asked the deputies to take E.D. with them, saying they could not care for him.

Deputy Hill said E.D. was not crying or upset when he got into the deputy's patrol car, though he was "bashful." E.D. periodically touched his lip as though it hurt during the twenty-mile drive back to the station. The deputy did not see the child interact with the Defendant, explaining that the Defendant entered through the back of the police station because he was under arrest, whereas he and E.D. entered through the front. Deputy Hill stayed with the child at the station approximately an hour before Investigator McConnell assumed responsibility for the child.

On re-direct examination, Deputy Hill said their visit to the Enos residence initially

5

had nothing to do with the victim in this case. The deputy said he occasionally must "babysit" a child in the course of responding to reports. Despite this, he said he clearly remembers the day he picked up E.D. because it was "the worst thing [he had] seen in ten years."

The trial court qualified E.D., who was seven years old at trial, to testify under Tennessee Rule of Evidence 603.

The child said he remembered living with "Daddy Pat and his parents," though he emphasized that Daddy Pat was not his real father. He said, "Nobody knows who my daddy was or is." E.D. said he could not remember whether the Defendant, who was seated in the court room, was the man he knew as Daddy Pat, who he said had a "real beard" when E.D. lived with him.

When the State's attorney asked E.D. whether Pat and his parents treated him well when he lived with them, he responded, "Yeah, but a little bit silly." He said the Defendant would come into his bedroom to see whether he was asleep and become "really mad" at him:

> Every once in a while when I went in there and went like this, one or two hours bam, he is in there saying are you asleep? Are you awake? Are you asleep are you awake? It had to be one of those two. I don't remember but he said that–keep on saying stuff then when I called my mama he said when you are sleep, when you are asleep you don't say anything. I would pretend to sleep like that and don't say anything where he would leave me alone.

E.D. said he knew what a penis is, which he referred to as a "kee wees," and he said that the Defendant hurt his penis. He said the Defendant would squeeze his penis as he pulled on it and that it hurt "really bad." E.D. said the Defendant would sometimes angrily do this when he caught E.D. urinating while sitting down on the toilet.

E.D. said that at one point the Defendant tied a sock around E.D.'s head and placed his penis inside E.D.'s mouth, but he told E.D. he was just putting a bar of soap in his mouth. E.D. knew, however, that it was the Defendant's penis rather than soap because it felt like a penis and because the Defendant kept saying, "[D]on't bite it." During one of the occasions the Defendant put his penis in E.D.'s mouth he urinated in E.D.'s mouth. The Defendant also made E.D. drink hot sauce and pepper one day, which E.D. said hurt very badly. E.D. recalled that the Defendant one day rubbed popsicles over E.D.'s naked body: "He put icicles like popsicles, those little stick things, all over my body, no clothes on, zero clothes."

6

E.D. testified that the Defendant whipped him with a black belt that had silver spikes. Viewing a picture of a black belt with spikes, Exhibit 8, he confirmed this was the belt the Defendant used to whip him. E.D. said the Defendant would make him run, explaining that he did not want to run, but the Defendant would "torture" him if he stopped running. He testified that the Defendant was frequently on the computer when he lived with the Defendant.

E.D. said he lived with the "girl in the pink shirt" (pointing at C.P.) in Alabama. When asked whether she treated him well, he responded, "Actually, yes."

On cross-examination, E.D. said he remembered going to Lincoln Medical Center and speaking with doctors and nurses at the medical center. He denied telling the hospital staffers that he felt safe where he lived with "Pat," and he said the staffers gave him candy every time he told the truth. E.D. then said:

> [The Defendant] really, really, really, really, really, really, really needs to go to prison, man. He done bad things. He made me–he–he even told a lie to me. He said me and him were going to watch t.v. at day time and just bam, he made me do exercises . . . every time I woke up.

E.D. said Investigator McConnell accompanied him to speak with people at Our Kids Center, located in Nashville General Hospital. He confirmed that he told someone at Our Kids Center that, when he was playing with Dakota when he was five years old, he fell off a bike that did not have training wheels. He did not remember whether he told the person questioning him that he hurt his groin area when this happened. He also did not remember whether he told the interviewer that this bike wreck caused the bruising in his groin area. Similarly, he did not remember whether he told the interviewer that the Defendant did not sexually abuse him. When asked by defense counsel whether he told the interviewer that the Defendant did not do anything bad to him, he responded, "Yeah, but I told them [the Defendant] didn't do anything good to me."

E.D. confirmed that he had spoken many times with the State's attorney and that they had gone over what he would say when he was called to testify. He did not remember whether he told the State's attorney that he fell from his bike and hurt his groin. He said that he had fallen from his bicycle "a lot" and that the first two times were "easy" but that the third time, when he was playing with Dakota, was "really hard."

E.D. said he did not know whether the Defendant was the man he knew as Pat, explaining that he remembered "Pat" looking a little younger: "He was a little bit younger the first time I met him. But he could have killed me. He would have killed me." When

7

defense counsel asked him who told him "Pat" could have killed him, E.D. responded, "I just saw it. He could have killed me. I couldn't breathe." He repeated that he was not sure whether the Defendant was Pat, exclaiming, "If you say that is Pat. I'll think I'll believe you. If you say that is Pat I'll believe it. If you just say–whatever you say, yes, no, I will just believe you. I believe anybody that is older than me." When asked whether he "believe[d] what anybody [told] him," he responded, "Unless somebody tells me a lie, I don't believe them. If they tell the truth, I will believe them." E.D. testified that no one had told him the Defendant was the man he knew as Pat and said he was only told that he could look at the Defendant if he wanted to but that he did not have to look at him.

E.D. said that he stayed at Mr. and Mrs. Enos's house for a "long, long time" and that he was "glad to be out of there." When asked how long he lived with the Enoses, he responded that he lived with them for two years, then, when pushed further, he said "Yeah, I think it was ten or maybe eleven years. I don't really know." As the child continued trying to explain how long he lived with the Enoses, the following exchange occurred between the child and the defense counsel:

[Defense Counsel]: You are saying [it] was at least a year, maybe two years?

[E.D.]: It can't be two years.

[Defense Counsel]: Maybe two years.

[E.D.]: Maybe, but maybe not. He tried to escape from the police. He even beat him over there. He tried to escape from the police two times.

[Defense Counsel]: Who tried to escape the police?

[E.D.]: (Indicating.) Maybe two or one times because I think the third time–I think the police got him on the third or second time. He tried to escape because he doesn't want me to be–he doesn't want me to be saying stuff. He wanted to do bad things to me. Some more bad things to me. That is why he just went, just grabbed me just went bang, bang, bang.

Yeah, there was one thing that he done. I didn't really know. His mama is still alive. If I knew that–if I knew that he done that I would just say, I hold Pat off; just call

8

911. He beat up his mother.

[Defense Counsel]: He beat up his mother?

[E.D.]: Yeah. He said if she would call 911 he would beat them up some more if she called 911. If she called–his mother–some more he would beat her up. He will beat she up again. Getting confused.

The child then agreed that Ms. Enos had been sick. He then, not in response to a question, told defense counsel that the State's attorney had given him a knife, saying he would give E.D. one hundred dollars if E.D. brought the knife back to him in exactly the same condition.

Defense counsel then said to E.D., "[Y]ou don't know how you got hurt, do you?" to which E.D. responded that, when he fell off his bicycle when he was four years old and living with C.P., he "just hurt [his] knees falling off." He said that he did not have a bicycle when he lived with the Enoses because the Defendant never bought him a bicycle. He then continued, saying, "He made me go tree to tree and this–tree to tree. Tree to tree to gate. Tree to tree and the gate." He did recall going to a friend's house while he lived at the Enoses' house and riding a "plastic ole baby bicycle, just a three track," which he said he did not fall from, explaining that because it had "one big wheel in the front and two wheels in the back," he "couldn't have fallen off of that thing." Upon further questioning by defense counsel as to whether he fell from this bike, the child voiced less certainty as to whether he fell from this bike:

[Defense Counsel]: You did or didn't [fall from the bike]?

[E.D.]: No.

[Defense Counsel]: When did you fall off of the bicycle?

[E.D.]: Never, I think. I don't know.

[Defense Counsel]: You don't know?

[E.D.]: The truth is I don't know. I think I fell off of it. I don't know.

[Defense Counsel]: You don't know.

9

When asked whether he still had seizures, the child responded:

> I think I got sauce right here and right here, because maybe if I did I think maybe I will just go like that and shoot out. I don't know. I got a shot right here and right here. I don't know how I got that. I think if I didn't, I think I would just go woosh, woosh, just words coming out. Just climb the walls.

Defense counsel then asked E.D. whether he cut his lip when he fell from the bike and the victim responded, "No. That was a long time ago when he hold his hand over my lips. Cut my lip right here. Right through here. I think that was just the hot sauce that burned the skin off of my mouth when I drank it."

When asked who he first told about the Defendant squeezing his penis, E.D. said the first time he talked about this was with the attorney for the State, Charles Crawford, two days before trial. He agreed that this was after he had already been to Lincoln Memorial Hospital and Our Kids of Nashville and after he had talked to Investigator McConnell. He then agreed that the first time he told anyone about the Defendant placing his penis in his mouth and pouring hot sauce in his mouth was also when he spoke with the State's attorney one or two days before trial. Later in his testimony, when asked again who he told about the Defendant touching his penis, he said he did not tell the Defendant because "he already knows," but that he had told various members of the State's team of attorneys in the days leading up to trial.

Defense counsel then asked E.D. whether "the people [in the State Attorney's office] that [he] talked to yesterday" gave him Skittles, and he said no. When pressed further, he said:

> Oh, yeah, hold on. I remember one thing that happened on–is this January what? January the 3rd day or–is this February what? It had to be yesterday. I didn't give Skittles. That man over there, he is a good friend and all, and oh, yeah, guess what, he is a good friend. Gave him a piece of gum that was in my car. I didn't eat it all because if I took it in there I would just eat it all if I was allowed.

> But I would give him whatever I had. If I was allowed I would give him the whole pack.

Defense counsel asked again whether anyone in the State's office had given him Skittles or candy "to get up here and say what you said today," and the child responded, "All I gave him was just gum. That is all I gave him yesterday, I think." Defense counsel then said, "So you

were?" and the child responded that he "[did not] have Skittles or anything" and that he had given someone in the State's office gum.

Toward the end of E.D.'s testimony, defense counsel again brought up the length of his stay with the Enoses:

[Defense Counsel]:   . . . . [Y]ou only stayed over there about three weeks; isn't that right?  Are you still saying it was two years?

[E.D.]:   I don't really know.  You can ask Pat.  He is the only one that knows.  I don't know.  It was like over 20 years ago.

[Defense Counsel]:   You don't know how long it was?

[E.D.]:   I do know one thing.  I got a choice to make.  I had a choice to make.  I had a choice to make.  Whoever–I couldn't go to the houses that–I think I can go to the house that those people offered me to go to, the foster home, Ms. Brown, because she is the first one I ever met.  She looks like a nice person.  When you get kind of used to her it looks like dang, she is brand new.

[Defense Counsel]:   You have a pretty vivid imagination.  You know what that means?

[E.D.]:   Uh-huh, I think–maybe I think ever time I have flashbacks or something.

[Defense Counsel]:   Every time you wake up you have flash backs?

[E.D.]:   Yeah.  Every time I wake up I have flash backs.  I have flash backs like–I never freeze up.  I never freeze.  That is the one thing.  I never freeze up.  I usually have flash backs when I wake up.

E.D. then denied that he "make[s] things sometimes sound worse than they really are." Defense counsel then asked the child to give him a yes or no answer to the following question: "What you have told up here today is what you were told today; yes or no?" to which the child responded, "Yes." Defense counsel concluded his cross-examination, and E.D. said, "Oh, man, I am tired."

11

On redirect examination by District Attorney General Crawford, E.D. said the general had not told him "what to say" but instead had told him "to tell the truth." He said the general had not made up what had happened, that "these things" had really happened, and that he was initially afraid to tell what happened because he was afraid of Pat. He said that the Defendant really had squeezed his penis, adding that "he also scared me."

He agreed that as time went on he became less afraid and started telling people. He said, "The only people I tell that really does need to know it is the people that really do need to know it, I just tell them." He then agreed that, when he first met with General Crawford two days before trial, he had told the general that he did not want "to tell this" and that he was "only going to tell it to the people that needed to know."

General Crawford asked that the record reflect: "how forcibly [E.D.'s] hands were [moving]" when he described the Defendant squeezing his penis and that, although E.D. would not identify the Defendant upon request, he pointed to the Defendant as he referred to "Pat" three times during his testimony.

When asked by the general how long a year is, E.D. said "Really long." He said he did not know how many days, weeks, or months were in a year but said he would know this, were he in the second grade. He agreed that when he said something happened ten years ago, he meant that it was a long time ago.

E.D. agreed the general had given his grandmother a knife to keep for E.D. but did not remember whether he said he would give E.D. one hundred dollars if he kept the knife shiny and new and brought it back in ten years. E.D. testified that, the day before trial, C.P. gave him a piece of candy and gave the general a piece of gum. He said the general had not given him candy at all, especially not for telling the general anything about the Defendant.

E.D. said he did not remember when he went to Our Kids hospital or how long after he left the Enoses' that he did so. He agreed that he was speaking with a lot of people around the time in question when he was five years old. He agreed that he has an imagination, which he sometimes uses to pretend that he plays football or that he is a police officer. He said he did not, however, make up the story about Pat. The general asked the child whether he remembered the Defendant, saying he had seen E.D. point to him several times, E.D. responded, "I think."

On recross-examination, defense counsel asked E.D. why he told General Crawford one thing and defense counsel another, and E.D. said, "It had to be him telling me something else and you telling me something else. It had to be that." He agreed that defense counsel had not given him anything, and when defense counsel asked whether he was "sitting up here

12

saying what [he] was told to say," he responded, "I don't really know. I really don't know."

Tammy Howell, a case manager with the Department of Children's Services ("DCS"), testified she became involved in E.D.'s case when the Lincoln County Sheriff's Department summoned her with abuse concerns the day they took E.D. from the Enos household. She said that upon arriving she noticed E.D.'s lips were extremely red and swollen, his bottom lip was blistered, and his tongue was swollen and had a laceration. She watched as Detective McConnell photographed the child. She recalled that while she waited with E.D. for another DCS Case Manager, Rita Owens, to arrive, she bought Skittles for E.D. After about thirty minutes, Owens arrived, and at about the same time Mr. and Mrs. Enos appeared. They had come to bring some of E.D.'s belongings to the Sheriff's Department. While Howell was speaking with the Enoses, E.D.'s mother arrived. Howell was only briefly able to observe E.D.'s interaction with his mother: she saw him walk past the room where his mother was seated and ask someone standing nearby whether the woman was his mother. Later, Howell observed while Owens and Detective McConnell interviewed the child.

During this interview, either Owens or Detective McConnell asked E.D. how he received the injuries to his groin area, and he said the Defendant would tell him to pull on his own penis and then the Defendant would pull and squeeze very hard on E.D.'s penis. When E.D. demonstrated on Detective McConnell how hard the Defendant squeezed, it appeared to Howell he was squeezing "extremely hard." Owens then contacted their supervisor Susan Brothers, who instructed them to take E.D. to the emergency room. Howell and Owens escorted E.D. and his mother to the emergency room, where several doctors examined E.D.

At Brothers' instruction, Owens and Howell placed E.D. in protective custody. About one week later, they transported him to Junior's House, a Lincoln County child advocacy center, where a forensic interview took place that Howell observed through an observation room. The forensic interviews that take place at Junior's House are "child-friendly" interviews designed to make the child feel comfortable in order to facilitate open communication. During this interview, E.D. said the Defendant would whip him with a "belt with pointy things on it" when E.D. was in trouble or would not go to sleep. He also said the Defendant would often put hot sauce in his mouth if he got in trouble. He did not mention either the injuries to his groin area or sexual abuse in this interview.

On cross-examination, Howell explained that Owens was the lead case manager on E.D.'s case and that she sat in on the interview at the sheriff's department because E.D. asked her to stay with him during the interview. She recalled that, in the ER, she and Owens sat outside the room in which E.D. was examined but that they could hear and see the examination taking place. She did not recall whether anyone asked E.D. whether he felt safe

13

in the Enos household. Howell said Owens and Detective McConnell conducted the forensic interview at Junior's House. She did not know whether the interview was videotaped. She explained that, because Owens had to leave the interview early, she entered the interview room to sit with E.D. while Detective McConnell completed the forensic interview. Howell did not have contact with E.D. between the forensic interview at Junior's House and trial.

Dr. Yashwant Patel, an internal medicine and emergency room specialist, testified he treated E.D. when he was brought to Lincoln County Hospital in April 2007. E.D. told Dr. Patel that he did not hurt anywhere, but the doctor noticed several bruises and cuts on E.D.'s body: an inch-size bruise on his back, an abrasion on his cheek, and a small cut on the inside of the cheek. He said E.D.'s penis and scrotum were bruised, slightly swollen, and a little tender to the touch. The pubic-area bruises were bluish, greenish, and yellowish in coloration. Dr. Patel advised Owens and Howell to take E.D. to be seen by a specialist. He testified that E.D.'s injuries were the result of trauma and said he could have received the injuries while playing, though such accidents do not usually cause bruising in the genital area. Dr. Patel said E.D.'s injuries could be the result of someone squeezing and pulling very hard on his penis.

On cross-examination, Dr. Patel testified that his anal examination of E.D. was normal and that the bruises to his penis and scrotum were four to five days old. He confirmed E.D. denied that anyone had physically harmed him in the last few months. He said his nurse was outside the room while he interviewed E.D.

Dr. Patel testified that E.D.'s injuries could possibly be the result of falling from a bike and striking the bar of the bike on the way to the ground. He also agreed that his injuries would not be inconsistent from falling from a small, plastic bike.

On redirect examination, Dr. Patel testified that although he had treated many people for bike wreck injuries in the course of his thirty-two year employment as an emergency room physician, he had never seen injuries such as E.D.'s that were bike-related.

Holly Gallion, a pediatric nurse practitioner with Our Kids Center in Nashville, explained that Our Kids Center is an out-patient center staffed mostly by Vanderbilt employees who perform evaluations on children who are the object of sexual abuse investigations. She testified that, although she had examined approximately 1750 children and assisted in three to five hundred examinations, she had never seen injuries similar to those which she observed on E.D.'s body. She said the inner part of E.D.'s lower lip had a deep scrape, and the skin on both sides of his lips looked raw. She saw bruises on his buttocks, his back, and his face.

14

Terri Simmons, a social worker at Our Kids Center, interviewed E.D. and afterward reported what she learned to Gallion. Gallion also spoke with a DCS case worker named Anna Rose. Given what she learned from these women and her own personal observations about E.D.'s injuries, Gallion arranged for a physician specializing in child physical abuse to examine E.D. As a result, Dr. Seth Scholer examined E.D. the next day.

Gallion testified that, although she examines around eight hundred child sex abuse victims a year, she had never seen physical abuse like that inflicted upon E.D. She explained that the substantial injuries to E.D.'s groin, scrotum, buttocks, and inner thigh differentiated his condition from the more common condition of merely having a swollen penis.

On cross-examination, Gallion said E.D. did not make any disclosures of sexual abuse to her. She also testified that a bike wreck could have caused the injuries to E.D.'s mouth.

Harold Leonard Enos, the Defendant's stepfather, said that the Defendant occasionally lived with him and his wife, who he explained could not testify because she suffered from Alzheimer's. He recalled that in March 2007, the Defendant, who had been living in Huntsville, Alabama, showed up at their home with E.D., saying E.D. was his child. Ultimately, the Defendant and E.D. stayed about three weeks with the Enoses, leaving only one time to visit the Defendant's friend, Michael Brown. Mr. Enos said the Defendant alone cared for E.D., despite his wife's requests to be allowed to, for example, bathe the child. He recalled that the Defendant would insist that E.D. was his son, and, as such, he would "raise him and take care of him."

Mr. Enos said E.D. did not have a bicycle while he was at their house, and he never saw E.D. ride a bicycle. He said that generally E.D. slept in a spare bedroom but that sometimes E.D. and the Defendant slept on a couch with a hide-a-bed. He agreed E.D. may have slept with the Defendant in his room occasionally. Mr. Enos said the Defendant's room was "pretty tore up" with "stuff scattered all over the place." Viewing a photograph of the floor in the Defendant's room, he confirmed the picture showed a spiked dog collar that belonged to the Defendant lying on the ground. He said that although the Defendant owned a pit bull, he kept a different collar on the pit bull and had only recently purchased the spiked collar displayed in the photograph. He confirmed that the Defendant kept many pornographic magazines, such as Hustler and Playboy, in his room.

Mr. Enos recalled that he and his wife kept hot sauce in the kitchen and that the Defendant frequently used hot sauce because he liked spicy food. He also testified that the Defendant spent "a lot" of time on the computer whereas he himself only used the computer once or twice to e-mail his sister. Mr. Enos testified he had neither seen nor knew anything about any movies or videos that might be on the computer.

He said the Defendant and E.D. were together "pretty much all the time," but explained that, because he left for work at 4:00 a.m. and did not return until 4:30 p.m., he did not observe the majority of the Defendant's interaction with E.D. When Mr. Enos was home, however, the Defendant and E.D. spent most of their time either watching television or playing games on the Defendant's computer.

Mr. Enos said that one morning, as he was preparing to go to work, he heard three or four spanking or smacking sounds coming from the living room where the Defendant and E.D. were sleeping on the hide-a-bed. When the smacking sounds ended, he heard the Defendant say, "I guess you will go to sleep now." Mr. Enos said that neither he nor his wife ever disciplined E.D. He said things generally were peaceful in the household unless his wife tried to intervene in the Defendant's actions toward E.D., at which point things "would get a little tight, a little hostile."

Several evenings, Mr. Enos saw the Defendant tell E.D. to run around the yard. The boy would do so, but Mr. Enos did not know whether the Defendant was forcing him to run. Although he never saw E.D. wet his pants, Mr. Enos heard the Defendant "holler" at E.D. for wetting his pants. He also heard the Defendant tell E.D. that sitting down to urinate would "make him a sissy." Mr. Enos testified that E.D. "didn't sleep very much," saying that the Defendant was always trying to get E.D. to say "yes, sir; no sir; yes, ma'am; no, ma'am." He confirmed that his wife once told the Defendant to "let him be a kid" as he was only five years old. He said the Defendant never worked while he lived in their house.

He recalled that one evening his wife showed him the inside of E.D.'s mouth, which was covered in white sores. The next morning, Mr. Enos called the sheriff's department. The deputies soon arrived, arrested the Defendant, and took custody of E.D. Although Mr. Enos never saw E.D. disrobed while E.D. lived with them, he had since seen the pictures of E.D.'s groin area. He confirmed that he allowed police to search his home several times.

On cross-examination, Mr. Enos confirmed that the Defendant fed E.D., made up his hide-a-bed for E.D., and folded and hung his clothing. He agreed that this behavior did not seem odd to him at the time because the Defendant had them "pretty well convinced" that E.D. was his son. He said that, on the morning he heard the smacking sounds, he was not sure that the Defendant was spanking E.D. because the mattress was covered in plastic and because he did not hear E.D. cry.

Mr. Enos testified that, from what he observed throughout the time E.D. lived in his house, E.D. appeared to be a happy, well taken care of child. Mr. Enos never saw the Defendant whip E.D.

16

Although the computer the Defendant frequently used, which they kept in the spare bedroom, belonged to Mr. Enos, he only knew how to use the internet on the computer. Mr. Enos was able to use the computer without entering a password, but he said the Defendant had set up three or four passwords to get into certain programs on the computer. Mr. Enos was aware only of his step-granddaughter occasionally using the computer; he said no one else used the computer. He never saw the Defendant view pornography on the computer.

He testified that, although the Defendant's own room was "a mess," he kept E.D.'s room straightened up. Though Mr. Enos was aware that Michael Williams had two young children and a small, plastic motorized scooter, he did not know whether E.D. rode the scooter when he and the Defendant visited Williams's house. Mr. Enos said the Defendant never hit his mother, though he said the Defendant "has had a few harsh words at her" and "has come close to" threatening to kill her before.

On redirect examination, Mr. Enos said he bought the computer from his daughter-in-law, who at one point came to their home and deleted material from the computer in order to make room for other programs. He did not know whether the material she deleted was pornographic. He recalled that, although he never saw the Defendant viewing pornography on the computer, when he or his wife entered the room while the Defendant was using the internet, he would quickly change what was displayed on the screen. He explained the spare room in which the computer was set up was the same spare room E.D. slept in, confirming that the Defendant and E.D. would spend time in the room on the computer alone.

Michael Williams testified that he had grown up with the Defendant and that he sometimes hunted on the Enoses' property. Williams, who was married with two children, said the Defendant visited his house where he lived with his family on "quite a few" occasions. One day, the Defendant called Williams to ask whether he could bring E.D. over to play with Williams children. Williams agreed, and the Defendant arrived later with E.D., who he explained was his son. Williams and the Defendant sat in the backyard, watching Williams's son play with E.D. He said they never left E.D. and his son unattended while they played, explaining that it was "kind of hard to leave a five-year old unattended."

Williams explained that his backyard is full of children's toys, including a swing set, a motorcycle, and a four wheeler. He said E.D. rode the motorcycle, and he never saw E.D. fall from the motorcycle. In fact, he said the boys played for two or three hours, and E.D. "never got hurt to the extent where he was crying or let [them] know that he was hurt." He reiterated that he was watching E.D. the entire time that he rode the motorcycle, and E.D. never fell off of the motorcycle. He also said no other type of accident occurred that would have caused E.D.'s injuries, explaining that he viewed the photographs of E.D.'s injuries before he testified. He said there was "no way" that E.D. sustained the injuries from

anything E.D. did while playing at his house. Further, he said that at the time E.D. rode the motorcycle, it could travel only four or five miles an hour, though he had since reset the motorcycle's maximum speed.

On cross-examination, Williams explained that the four-wheeler in his backyard was a small "power wheels" toy from Wal-Mart. He confirmed that his son and E.D. each rode the motorcycle, the four-wheeler, and the bicycle and played on the swing set. He reiterated that he was watching the boys the whole time they played, explaining that, because his house was located on a half-acre lot, it would have been very difficult for the boys to have done anything without him seeing it.

Anna Rose, a foster care family service worker for DCS, testified that the Lincoln County Department of Human Services office summoned her on April 5, 2007, around 3:00 or 4:00 p.m. When she arrived, she and another on-call worker, Kelly Groover, were asked to drive E.D. to Nashville to be examined by Our Kids. The three arrived at the Vanderbilt ER around 8:30 p.m. that night. She and Groover were asked to leave the room while someone performed an initial intake interview with E.D. They were allowed to re-enter the room and observe while Gallion performed a physical evaluation upon E.D. During this examination, Gallion tried gently to lift E.D.'s penis in order to properly photograph it but because this hurt E.D. too much, E.D. lifted his penis and scrotum himself.

Rose recalled that E.D.'s feet and socks were so soiled that Groover threw away his socks, washed his feet, and gave him new socks. She said E.D.'s clothing was dirty and that he had "an odor to him." After Vanderbilt Hospital released E.D. around 12:30 a.m., the two ladies drove E.D. to the home of Nancy Brown, who DCS had designated as E.D.'s temporary foster mother. Throughout the next year while he was staying with Brown, Rose visited E.D. about twice a month. She supervised several visits between E.D. and C.P. during this time. Eventually, C.P. was awarded unsupervised visitation and then ultimately given temporary legal custody of E.D. Rose continued to contact E.D. after he moved back to Alabama with C.P.. She testified that E.D. was seeing a counselor in Alabama.

Joyce McConnell, a criminal investigator with the Lincoln County Sheriff's Department, testified that she has special training in the area of interviewing child abuse victims. She explained that properly interviewing a child victim requires the interviewer to refrain from asking leading questions and otherwise suggesting an answer to the child.

Detective McConnell received a call on the morning of April 5, 2007, informing her that a young child with serious injuries was at the Lincoln County Sheriff's Department. When she arrived, E.D. and his mother were both present but they were in separate rooms. She echoed other witnesses's description of E.D. on that day, adding that he appeared "frail,

18

thin, [and] pale" to her. The way E.D. spoke awkwardly due to his swollen lips stuck out most in the detective's memory. She recalled that his clothes were dirty and a little too big for him and that his breath had an odor.

Detective McConnnell remembered that, at one point, the child spilled "a little drop of milk" and immediately began saying "I am sorry, I am sorry, I am sorry." The detective interviewed E.D. in the presence of several DCS workers. After this interview, she suggested to the DCS workers that they take E.D. to the hospital. The detective later received word that E.D. had been taken to Our Kids in Nashville and that further physical examination at Our Kids was necessary.

The detective then had the Defendant brought into an interview room and, after Mirandizing him, interviewed him. Showing the Defendant the photographs they had taken of E.D.'s mouth and groin area, the Defendant said E.D. had simply woken up one day with his mouth swollen and blistered, and he gave E.D. hydrogen peroxide and mouthwash to numb the pain. As for the injuries to E.D.'s groin, the Defendant said that "the only thing he could think of" was that E.D. had hurt himself while playing at Michael Williams's house. The Defendant told the detective that E.D. was his son. The Defendant gave a written statement, reproduced below:

> I thought [E.D.] had a fever blister in his mouth. He had been congested, so I had been giving him Benadryl and baby aspirin. The next morning his lip appeared to be blistered so I cleansed it up and started spraying it with chloraseptic. He had few accidents on a friend's battery powered motorcycle is the only way I can explain his penis. I have caught him pulling and tugging at it. But thought nothing of it. He never told me that he hurt or showed me so I knew nothing of it.

She testified that her conversations with the physicians who treated E.D., with Mr. and Mrs. Enos, and with Amanda Williams (Michael Williams's wife) did not dissuade her from pressing charges against the Defendant.

Detective McConnell said that during one of several searches of the Enoses' home, she seized various pornographic items, including Playboy and Penthouse magazines and articles on bestiality and other "disturbing things such as torturing women" from the Defendant's room. She also seized VHS tapes, floppy disks, and a computer from the Defendant's room. The detective testified that the computer contained a twenty-second video clip of a child between eight and eleven years old performing oral sex on an unidentified male. She turned the computer over to the Tennessee Bureau of Investigation ("TBI"). Detective McConnell found a wadded up paper towel underneath the bed in the

19

spare room in which E.D. slept while he stayed with the Enoses. She also turned this paper towel over to the TBI.

Detective McConnell was present during the forensic interview of E.D. at Junior's House. She recalled that during this interview E.D. mentioned the Defendant pulling on his penis, making him run, and becoming angry with him for sitting down to urinate. E.D. said the Defendant also would make him drink hot sauce. He also said the Defendant whipped his buttocks with his hand, a flyswatter, a belt, and an object with "point things." This latter description confused the detective initially, but when she showed E.D. pictures of the Defendant's room during a later interview in May, E.D. identified the spiked collar lying on the floor as the object with "point things" the Defendant used to whip him. Later, when the detective was examining the tapes and magazines seized from the Defendant's home, she found a picture of a penis ejaculating into the mouth of a woman wearing a black spiked collar.

The detective spoke with C.P. a few days after the forensic interview, and she spoke with Ms. Brown, E.D.'s foster mother, a few weeks later. Ms. Brown told the detective that E.D. had made disclosures about the Defendant's behavior to her.

On cross-examination, Detective McConnell testified E.D.'s demeanor during his trial testimony was typical of his demeanor during her various interviews with him.

Dr. Seth Scholer, a board-certified general pediatrician, estimated he saw between two and ten cases of child abuse or mistreatment in a year. Dr. Scholer treated E.D. when he was brought to Vanderbilt Hospital. He described E.D.'s injuries, recalling that he ordered a coagulation profile that ruled out the possibility that a bleeding disorder caused the severe groin-area bruising. Saying that the cause of his bruises could not be definitively stated, he testified that the bruises, which were "in a quite unusual pattern," were atypical of childhood bruising. He said it was "possible but unlikely" that E.D. received his injuries from a bicycle or small scooter accident. The doctor, while acknowledging many things could have caused E.D.'s injuries, testified that physical maltreatment was the most likely cause of his injuries. He also confirmed that pulling and squeezing on E.D.'s penis "certainly" could have caused his groin-area bruising.

On cross-examination, Dr. Scholer confirmed that he examined E.D. for about an hour and that, during this time, E.D. said he did not know how he received his injuries and mentioned the possibility of a bike wreck. He confirmed that the medical report he prepared of E.D.'s examination stated that E.D. complained of pain in his thumb and lip for one week. He explained that the report did not indicate E.D. suffered from ADHD because he did not possess E.D.'s medical history at the time.

20

The parties then agreed to the following stipulation:

Douglas Williams, who is present here in the Lincoln County Courthouse and is available to testify, is a Special Agent with the [TBI] in the technical services unit and he is an expert in the area of forensic computer examinations.

And that Special Agent Williams examined the computer that was seized by Detective McConnell on April 11, 2007.

When he examined the computer he discovered one video clip that is by agreement of the parties child pornography. The video file name is Best Vicky BJ and hand job with sound . . . .

The parties agree the video depicts an underage female approximately eight to eleven years of age performing oral sex on an adult male.

The underage female in the video has been reported on the National Child Victim Identification Program of the National Center for Missing and Exploited Children as either a missing or exploited child.

The agent is very familiar with this video. He sees it. Quite often comes up with child pornography cases.

And the video had been saved or downloaded to the computer in question on March 30th, 2007.

By virtue of this stipulation, this will eliminate the need for actually having to play a 20 second video of child pornography to the jury.

That is the purpose of the stipulation so they will not have to be exposed to that. We agreed to the content of it and the significance of it.

Charles Hardy, a Special Agent Forensic Scientist in the serology and DNA unit of the TBI, received for analysis the wadded paper towel seized from beneath E.D.'s bed. He explained that the wadded up paper towel actually turned out to be two paper towels. His colleague, Lori Lee Staples, examined the paper towels for body fluids and other genetic material. Agent Staples found several yellow, crusty areas on the towels. She then tested the towels for semen by laying a damp filter paper on each towel, a process that transferred part of the crusty material to the filter paper. She then sprayed the filter paper with a chemical that turns purple when it comes into contact with semen, and the paper turned purple. Agent

21

Hardy explained that the TBI crime lab considers this a "presumptively positive test" for semen.

Agent Staples then cut from the towels the portions that were yellow and crusty and transferred some of the material to a microscopic slide. She identified semen when she viewed the slides under a microscope. The TBI considers this a "confirmatory test for the presence of semen." In summary, Agent Staples concluded that each paper towel contained semen. The TBI crime lab obtained DNA samples from both E.D. and the Defendant, which they used to create DNA profiles for each person.

Agents then removed a quarter-inch square material from a yellow, crusty portion of the paper towel and examined its DNA content. The material contained both a sperm and a non-sperm fraction, which consists of epithelial cells, and agents used thirteen-point DNA mapping technology to create a DNA profile of the donor of the sperm fraction. The sperm fraction DNA profile matched the Defendant's DNA profile; therefore, the Defendant was the donor of the sperm fraction of the material on the paper towel.

Because epithelial cells are outer skin layer cells, they sometimes are present in saliva. They also occasionally appear in urine. The TBI's analysis did not indicate whether the epithelial cells found in the non-sperm fraction were transferred to the paper towel through urine, saliva, or direct contact with the donor's skin. The non-sperm fraction of the material contained epithelial cells from a mixture of two different donors. Agents created DNA profiles of each donor and concluded that E.D. was the major contributor of the non-sperm fraction and that the Defendant was the minor contributor of the non-sperm fraction.

The TBI crime lab also examined the spiked dog collar seized from the Defendant's room for genetic material. Swabs taken from the collar revealed the presence of a mixture of non-sperm genetic material from three different donors: two males and one female. Agents were only able to construct partial DNA profiles of the genetic material contributed by the males. Although this prevented agents from conclusively matching the material to another DNA profile, agents determined that the Defendant and E.D. could not be excluded as contributors of the male portions of the genetic material. Agent Hardy said epithelial cells could have transferred to the collar when a donor either held or was struck by the collar

On cross-examination, Agent Hardy elaborated that, of the two wadded paper towels that he received from police, one was white, and the other was white with a green floral design. He said no test exists to determine how long a genetic material has rested on a particular object. He also said he had no way to determine whether the E.D. and the Defendant's genetic material were transferred to the paper towels at the same time.

The State closed its proof, and defense counsel moved for a judgment of acquittal, arguing that the offense of attempted incest requires that the victim is actually related to the defendant and that, as such, the evidence, which established that E.D. was not the Defendant's son, was insufficient for the jury to conclude the Defendant committed attempted incest. The trial court, noting that attempted incest requires only that the Defendant believed E.D. was his son, denied the Defendant's motion.

The trial court then conducted a *Momon*[2] hearing, and the Defendant testified. The Defendant was forty-three at the time of trial, said he moved into his mother and step-father's house in Elora, Tennessee, around March 3, 2007. On March 9, E.D.'s mother called the Defendant. As a result of that call, the Defendant agreed to "take [E.D.] in and raise him." At this time, he believed E.D. was his son. When E.D. arrived, he came with clothes in a variety of sizes and conditions and with hardly any toys. The Defendant was not working at this time.

The Defendant said E.D. was "a good kid," though he said he was "a little wild" and "wound tight." He said E.D. would stay seated only long enough to eat or watch a cartoon. The Defendant said the room E.D. stayed in was about four or five feet from his own room. He said many people, including E.D., his mother and stepfather, and several of his step-father's sons and their wives and children had access to the computer in his room. He said that he personally observed four people besides himself use the computer during the month that he lived in the house. Admitting that he had viewed pornography on the computer, he denied downloading the child pornography video found on the computer.

The Defendant depicted his relationship with E.D. as harmonious and nurturing, saying:

> He was like my little buddy. We played. I took care of him. I cooked for him. I would feed him. I would fix his shower.
>
> We played games. We did everything together pretty much. He was like my little buddy. I treated him like he was my child. I thought he was.

The Defendant said he and E.D occasionally played a child's computer game, which he retrieved from a cereal box, on the computer in his room. He said the computer was connected to the internet at all times.

The Defendant said E.D.'s imagination was "pretty wild" and "pretty vivid," saying

---

[2]*See Momon v. State*, 18 S.W.3d 152 (Tenn. 1999).

E.D. was "pretty far out there sometimes."

The Defendant explained he took E.D. to his friend Michael Williams' house so that E.D. could interact with Williams' son and play with the family's toys, things he could not do at the Enoses' home. He said that the boys rode bikes, a scooter, and a battery powered motorcycle and that they wrestled and jumped on a trampoline.

Asked about arguments he had with his mother while he and E.D. lived with the Enoses, the Defendant said he occasionally "had disagreements" with his mother when she would try to "do things for [E.D.]" The Defendant testified that his mother, who was seventy-two and suffered from occasional strokes, should not care for E.D. because E.D. was his child, and he was "there and perfectly capable of doing things for [E.D.] [him]self." He said he never hit his mother, and neither E.D. nor his mother had ever called 9-1-1 to report him for hitting his mother.

The Defendant said that, although he picked out E.D.'s clothing, E.D. dressed himself during the time they lived together. Similarly, he said that, although he would run E.D.'s baths, E.D. would disrobe, bathe, and dress himself in total privacy, with the bathroom door closed. The Defendant also said that he was never naked around E.D. because he "didn't think it would be right."

The Defendant said that, two days before he was arrested and E.D. was taken into protective custody, he noticed that E.D.'s lips were swollen and covered in what he believed were ulcers. The Defendant testified that he "tried to doctor [E.D.] as best [he] could," cleaning the sores with peroxide, applying Benadryl spray and Chloraseptic spray to the sores, and giving E.D. baby aspirin.

The Defendant confirmed that he applies hot sauce to his food in large quantities but insisted that he never put hot sauce inside E.D.'s mouth. He similarly denied forcing E.D. to run around in the Enoses' yard, saying that E.D. would ask him to watch how fast he could run and then demonstrate by running around the yard. He testified that he never whipped E.D. and that he never ran behind E.D., chasing him with a belt. He denied both forcing E.D. to perform oral sex and forcefully squeezing E.D.'s penis. As to E.D.'s statement that the Defendant had forced him to pee standing up because "big boys pee standing up," he said that E.D. actually initiated the conversation about whether to sit or stand while urinating, asking the Defendant whether "little boys stand[] up to pee and little girls sit[] down to pee." He testified that he replied simply, "[Y]es, baby, that is how it is done."

As to the spiked dog collar found in his room, the Defendant testified he bought the collar for his pit bull to wear during trips to the veterinarian. He explained he did not,

24

however, get a chance to place the collar on the pit bull because he did not have enough money to take him to the veterinarian. He explained that this was why the collar still bore its original tag. The Defendant stated that he never whipped E.D. with the collar.

On cross-examination, the Defendant confirmed that he had a beard when he was living at his parents' house with E.D. He insisted that the reason he did not want his mother to help care for E.D. was that he did not want his mother to over exert herself in light of her health conditions. The Defendant said he would have allowed Mr. Enos to care for E.D., had Mr. Enos offered to help, though he acknowledged that Mr. Enos left for work before dawn and returned in the evening. He rejected the state attorney's suggestion that he rebuffed his mother's attempts to care for E.D. because he wanted to be solely in control of E.D.

The Defendant again denied pouring hot sauce in E.D.'s mouth. He acknowledged that he complained about E.D. not sleeping at night but denied forcing E.D. to run outside in order to exhaust E.D.'s energy. Confirming that he had heard Agent Hardy's testimony that the spiked dog collar bore DNA that could not be excluded as E.D.'s, he continued to deny hitting E.D. with the dog collar or any other instrument. He again denied E.D.'s allegation that he had angrily squeezed and pulled E.D.'s penis. Confirming he heard the various witnesses who said E.D.'s injuries most likely were not the result of routine play or roughhousing, he maintained his denial of having harmed E.D, saying, "I do not know what caused those injuries. Specifically I do not know."

As to why his friend Michael Williams would testify that E.D. could not have received his injuries at his family's home, the Defendant surmised that Williams was lying to prevent being held liable for E.D.'s injuries and to prevent DCS from investigating Williams for his own childcare practices. He insisted that, for a brief period during the time they visited the Williams's house, the boys played inside the house, out of their view. The Defendant said he believed he saw E.D. "almost hit a truck one time" but testified he had definitely seen E.D. run into a barrel. He said he also saw E.D. wreck the battery-operated motorcycle two times but testified that E.D. never cried, held his groin area as though he was in pain, or complained about any pain from these wrecks. He said E.D. never came to him, as he did to the Sheriff's deputies, and showed him his bruised and swollen penis and scrotum. He agreed that, if he had been the one injuring E.D., complaining to him would have been pointless.

The Defendant denied blindfolding E.D. with a sock and placing his penis in E.D.'s mouth. He suggested that his semen and E.D.'s DNA were present on the same paper towel perhaps because he cleaned E.D.'s mouth with the paper towel, left it lying near the computer, and later used it to clean himself up after masturbating:

25

I had a paper towel and I wiped [E.D.'s] mouth. When I noticed his lip swelling, he started drooling. I wiped the drool off. I left it laying at the computer table.

On the 4th of April, [E.D.] was not feeling well. He didn't feel well on the 3rd. He felt even worse on the 4th. He was running a fever. I fixed him up a recliner in my bedroom where he could watch cartoons; lay back; get comfortable; watch cartoons.

I was in the middle bedroom. I masturbated. I grabbed the same paper towel and cleaned myself. I guess I just forgot about it and run off and it was on my lap and fell and it got kicked under the bed. I don't know how it got under the bed.

The Defendant agreed that, although he bought a collar for his pit bull, he did not buy E.D. clothes during the three weeks he lived with the Enoses because he did not have any money.

Having heard the above proof, the jury found the Defendant guilty of each of the charged offenses, including rape of a child, aggravated child abuse, aggravated child neglect, sexual exploitation of a minor, and attempted incest. The trial court held a sentencing hearing wherein it admitted the Defendant's presentence report. According to the presentence report, the Defendant, who was forty-two at the time of sentencing, began using drugs and alcohol at age nine and dropped out of school in the tenth grade. The same year he dropped out of school he completed a drug abuse program at a mental health facility. The Defendant is bi-polar and became addicted to heroin when he began using heroin to self-medicate his bi-polar disorder. At the time of sentencing, he stated he had been "recovering" from his heroin addiction for one year.

The Defendant reported being charged with driving under the influence in 1985. He was convicted of assault in 1995 and sentenced to probation, which he violated three months later. The Defendant was convicted of resisting arrest in 2006 and again received probation, only to violate it three months later. He stated that he worked in Alabama as an electrician between 1999 and 2001 and as a "mason's helper" in 2002.

At the conclusion of the hearing, the trial court announced that it found no mitigating factors to apply to the Defendant's convictions, but it applied several enhancement factors to the Defendant's convictions. It applied enhancement factor (1), that he had a previous history of criminal convictions and behavior in addition to those necessary to establish his range, to each of his convictions; enhancement factor (4), that the victim was particularly vulnerable because of age to each of his convictions; enhancement factor (5), that the

Defendant treated the victim with exceptional cruelty, to his attempted incest conviction; enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great, to his aggravated child abuse, aggravated child neglect, and attempted incest convictions; enhancement factor (7), that the offense involved a victim and was committed to gratify the Defendant's desire for pleasure and excitement, to each of his convictions; enhancement factor (8) that the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community, to each of his convictions; enhancement factor (12), that during the commission of the felony the Defendant intentionally inflicted serious bodily injury upon another person or the action of the Defendant resulted in the death of or serious bodily injury to the victim or a person other than the intended victim, to his aggravated child abuse, aggravated child neglect, and attempted incest convictions; and enhancement factor (14), that the Defendant abused a position of public or private trust in a manner that significantly facilitated the commission of the fulfillment of the offense, to each of his convictions.

The trial court sentenced the Defendant to seventeen years each for his aggravated child abuse and aggravated child neglect convictions; to four years each for his sexual exploitation of a minor and attempted incest convictions; and to twenty-five years for his rape of a child conviction. The trial court found that the following three consecutive sentencing factors applied to the Defendant's conviction: consecutive sentencing factor (2), that the Defendant is an offender whose record of criminal activity is extensive; consecutive sentencing factor (4), that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; and consecutive sentencing factor (6), that the Defendant is sentenced for an offense committed while on probation. The trial court ordered the Defendant to serve his sentences consecutively. The Defendant now appeals these judgments.

## II. Analysis

On appeal, the Defendant contends the trial court erred when it denied his motion for a judgement of acquittal; that the evidence was insufficient to support his convictions; that the trial court committed plain error when it instructed the jury on the offense of rape of a child; and that the trial court erred when it sentenced the Defendant.

### A. Motion for Judgment of Acquittal

The Defendant first claims the trial court erred when it denied his motion for judgment of acquittal with respect to his attempted incest charge. He argues that, because the State's proof established he is not E.D.'s father, the evidence was insufficient as a matter of law to

support a conviction for attempted incest. The State contends the Defendant waived review of this issue by presenting proof after the trial court denied his motion for judgment of acquittal.

Tennessee Rule of Criminal Procedure 29(b) provides:

Motion Before Submission to Jury. Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the State is not granted, the defendant may offer evidence without having reserved the right.

In *Mathis v. State*, 590 S.W.2d 449 (Tenn. 1979), the Tennessee Supreme Court held that when a trial court:

[O]verrules, or does not act, upon a motion for an acquittal made at the conclusion of the State's proof, if counsel is convinced as to the validity of the motion, he or she must then and there take affirmative action to confine the controversy to the proof already presented. He or she should announce that the defendant stands on his motion, will present no proof, disclaims any benefit of any evidence introduced by his defendant, disavows any detriment, and should state that the evidence presented by the co-defendant will not be binding upon him, and he should participate no further in the trial until after the conclusion of all the proof.

*Id*. at 453. The Court went on to state that, by failing to close his case and by participating in the trial, the defendant in that case waived the error in the action of the court on his motion for an acquittal. *Id.*

The Tennessee Supreme Court discussed its previous holding in *Mathis* and recognized the "difficult choice" facing a defendant if the defendant moves for a judgment of acquittal at the close of the State's proof and the trial court does not grant that motion. *Finch v. State*, 226 S.W.3d 307, 316-17 (Tenn. 2007). The Court stated, "While we are sensitive to the conundrum facing defense lawyers under its holding, we need not revisit our

28

decision in *Mathis* in this case unless we determine that the proof was insufficient to support the Petitioner's convictions as of the close of the State's case-in-chief." *Id.*

In the case under submission, the Defendant did not stand on his motion for judgment of acquittal but rather continued participating in the trial. He, in fact, testified on his own behalf. As noted by the Tennessee Supreme Court, *Mathis* has not been overruled, and it is binding precedent on this Court. Therefore, the Defendant waived his right to appeal from the trial court's refusal to grant his motion for judgment of acquittal. *Mathis*, 590 S.W.2d at 453. Further, because the Defendant elected to introduce evidence, "'the appellate review encompasses the evidence in toto.'" *Finch*, 226 S.W.3d at 316 (quoting *State v. Rutan*, 194 Conn. 438, 479 A.2d 1209, 1211 (Conn. 1984)).

### B. Jury Instructions for the Offense of Rape of a Child

The Defendant contends the trial court erred when it included recklessness in its description of the elements of rape of a child. Acknowledging that he failed to object to this instruction at trial, he argues the instruction was plain error. The State responds, first, that the inclusion of recklessness in the jury instructions did not breach a clear and unequivocal rule of law and, second, that the instruction did not affect a substantial right of the Defendant because the Defendant claimed not that he lacked the requisite mens rea to rape E.D. but that he did not actually sexually penetrate E.D.

An appellate court may review an issue which would ordinarily be considered waived if the court finds plain error in the record. Rule 52 of the Tennessee Rules of Criminal Procedure states, "An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). Whether an issue rises to the level of plain error is a decision that lies within the sound discretion of the appellate court and may be considered to do substantial justice or to prevent needless litigation, injury to the interests of the public, prejudice to the judicial process, or manifest injustice. *See* Tenn. R. App. P. 13(b); Tenn. R.Crim. P. 52(b); *State v. Adkisson*, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994). In *Adkisson*, this Court stated that an appellate court must consider each of the following factors in determining whether an error constitutes "plain error": (1) the record must clearly establish what occurred at the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused must not have waived the issue for tactical reasons; and (5) consideration of the issue must be "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 641-42 (citations omitted). Our Supreme Court characterized the *Adkisson* test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain

error. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000). Furthermore, complete consideration of all five factors is not necessary once it is clear from the record that at least one of the factors cannot be satisfied. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

In criminal cases, a defendant has a right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). The failure to do so deprives the defendant of the constitutional right to a jury trial and subjects the erroneous jury instruction to harmless error analysis. *Id*. at 433-34. In evaluating claims of error in the jury charge, this court must review the charge in its entirety and read it as a whole. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges,* 944 S.W.2d 346, 352 (Tenn. 1997).

In this case, the trial court instructed the jury as follows:

> For you to find the defendant guilty of [the offense of rape of a child], the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> > (1) that the defendant had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of the defendant; and
> >
> > (2) that the alleged victim was more than three (3) years of age but less than thirteen (13) years of age; and
> >
> > (3) that the defendant acted either intentionally, knowingly, or recklessly.

Regarding the requisite mens rea for each element, the trial court stated the following:

> "Intentionally" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.
>
> "Recklessly" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards, a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from

30

the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

The requirement of "recklessness" is also established if it is shown that the defendant acted knowingly or intentionally.

Citing a 2006 opinion from this Court, the Defendant argues that the trial court erroneously instructed the jury that a defendant must act "intentionally, knowingly, or recklessly" in order to commit rape of a child. *See State v. Charles L. Williams*, 2006 WL 3431920, No. M2005-00836-CCA-R3-CD (Tenn. Crim. App., Nov. 29, 2006), *no Tenn. R. App. P. 11 application filed*.

"When an offense has different mens rea for separate elements, the trial court must set forth the mental state for each element clearly so that the jury can determine whether the state has met its burden of proof." *State v. Howard*, 926 S.W.2d 579, 586 (Tenn. Crim. App. 1996). In 2004, a panel of this Court found no error in a set of rape of a child jury instructions identical to those issued in this case. *State v. Chester Wayne Walters*, 2004 WL 2726034, No. M2003-03019-CCA-R3-CD (Tenn. Crim. App. Nov. 30, 2004), *perm. app. denied* (Tenn. Mar. 21, 2005). Two years later, this Court released *State v. Charles L. Williams*, in which the authoring judge reviewed the same jury instructions but found that they were in error. We note, however, that in *Williams* the two non-authoring judges dissented from the author's conclusion that the instructions were in error but concurred in the result, which reversed the defendant's convictions and remanded for a new trial.

We find no error in a jury instruction that generally instructs that rape of a child must be committed either "intentionally, knowingly, or recklessly" and then informs the jury it must find the defendant intentionally committed the nature of conduct element of each offense. Such a jury instruction, "read as a whole," "set[s] forth the mental state for each element clearly so that the jury can determine whether the state has met its burden of proof." *See Leach*, 148 S.W.3d at 58; *Howard*, 926 S.W.2d at 586. Our conclusion is in line with *Walters* and the numerous opinions since released that have agreed with its result. *See, e.g., State v. Joel E. Blanton*, No. M2007-01384-CCA-R3-CD, 2009 WL 537558 (Mar. 4, 2009), *perm. app. denied* (Aug. 24, 2009); and *State v. Frederick Leon Tucker*, No. M2005-00839-CCA-R3-CD, 2006 WL 547991, at *13 (Tenn. Crim. App., Mar. 7, 2006), *no. Tenn. R. App. P. 11 application filed*.

We conclude that the trial court in this case properly instructed the jury. Further, the prosecution argued only intentional penetration, and the Defendant neither raised a defense of recklessness nor presented evidence of reckless penetration. As such, the jury's guilty verdict implies that it found that the Defendant intentionally penetrated the victim. Because

31

a more detailed jury instruction on recklessness, therefore, would not have changed the outcome of the trial, the instruction as delivered did not prejudice the Defendant. *See Williams*, 2006 WL 3431920 at *27; *Momon v. State*, 18 S.W.3d 152, 167 (Tenn. 1999). In summary, the trial court did not breach a "clear and unequivocal rule of law," and its instruction did not prejudice the Defendant. As such, the trial court did not commit plain error when it instructed the jury on rape of a child. *Adkisson*, 899 S.W.2d at 641-42. The Defendant is not entitled to relief on this issue.

## C. Sufficiency of the Evidence

The Defendant launches numerous attacks against the sufficiency of the evidence underlying his convictions. They include: (1) that the evidence supporting the Defendant's convictions is only circumstantial and fails to establish a "web of guilt" around the Defendant; (2) that the victim failed to identify the Defendant in court as his abuser, who he knew as "Pat"; (3) that, because the evidence shows that the Defendant attempted several home remedies for the sores on the victim's mouth, the Defendant did not commit aggravated child neglect; (4) that, because the victim originally failed to disclose any abuse and because several doctors testified at trial that a bike wreck could have caused the victim's groin injuries, the evidence was insufficient to support a conviction for aggravated child abuse; (5) and that, because the victim's testimony was "erratic" and "nonsensical" and because he did not originally disclose any abuse, the evidence was insufficient to support his convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State,* 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). Stated differently, "[B]efore an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances 'must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id*. The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

33

We address the aspects of the State's case to which the Defendant objects.

## 1. Circumstantial Evidence

As the Defendant correctly points out, where only circumstantial evidence supports a defendant's convictions, the evidence must be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *See Crawford*, 470 S.W.2d at 612. The evidence against the Defendant is not, however, wholly circumstantial. In fact, the record contains direct evidence that the Defendant committed aggravated child abuse, aggravated child neglect, rape of a child, and attempted incest. For example, the victim testified that the Defendant squeezed and pulled on the victim's penis, placed his own penis in the victim's mouth, and poured hot sauce in the victim's mouth. The Defendant testified that he believed E.D. was his son. The evidence shows also that the Defendant introduced E.D. as his son to his parents and to friends. Also, the record is clear that the Defendant did not seek medical treatment for either the sores in E.D.'s mouth or the bruises to his groin area, which the victim testified that the Defendant caused and, consequently, of which the Defendant was aware. Because the record contains direct evidence of these crimes, we will not address the Defendant's contention that the evidence failed to establish the Defendant's guilt to the exclusion of any other reasonable hypothesis.

We will address the Defendant's contention that the circumstantial evidence supporting his conviction for sexual exploitation of a minor was insufficient. Indeed, the record contains only circumstantial evidence that the Defendant downloaded the illicit video located on the computer in the Defendant's bedroom. The Defendant testified he began staying with the Enoses on March 3, 2007, and he stipulated along with the State that the video was downloaded on March 30, 2007, while he was still living in the Enos household. The Defendant acknowledged using the computer, and Mr. Enos testified that the Defendant used the computer "a lot" and frequently would minimize the screen when Mr. Enos or his wife entered the room. Several other family members, however, used the computer when they visited the house. Although another family member possibly could have downloaded the video, this possibility does not, to this Court, preclude a jury from drawing the reasonable inference that the Defendant downloaded the video. *See Rice*, 184 S.W.3d at 662. Indeed, in our view, the evidence as a whole weaves a "web of guilt. . . around the defendant from which he cannot escape" and contains facts and circumstances from which "the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Crawford*, 470 S.W.2d at 612. He is not entitled to relief on this issue.

## 2. Defendant's Identity as Perpetrator

The Defendant argues that, because E.D. testified he was not certain whether the

Defendant was the man he knew as "Daddy Pat," the evidence was insufficient to establish the Defendant's identity as the perpetrator of the crimes against E.D. The State responds that E.D.'s partial recognition of the Defendant coupled with the mountain of evidence that the Defendant was the man E.D. knew as "Daddy Pat" sufficiently established the Defendant's identity as the perpetrator of the crimes against E.D.

The identity of a perpetrator is an essential element of any crime, and therefore must be proven by the State beyond a reasonable doubt. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). "Sufficient proof of the perpetrator's identity may be established by circumstantial proof alone." *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). A victim's identification of a defendant, therefore, is not necessary in order to establish the defendant's identity as the victim's attacker. *See, e.g., State v. Rickey Dickerson*, No. W2008-00301-CCA-R3-CD, 2009 WL 1219105 (Tenn. Crim. App., May 4, 2009), *perm. app. denied* (Tenn., at Jackson, Oct. 19, 2009); *State v. Pewitte*, W2008-00747-CCA-R3-CD, 2009 WL 29891, *6 (Tenn. Crim. App., at Jackson, Jan. 5, 2009), *no Tenn. R. App. P. 11 application filed*.

Where only circumstantial evidence supports a defendant's identity as perpetrator, the facts must be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." *Reid*, 91 S.W.3d at 277. Issues of identity and credibility are classic jury questions. *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005), *no Tenn. R. App. P. 11 application filed*. Questions concerning the credibility of the witnesses are resolved by the trier of fact. *Evans*, 108 S.W.3d at 236. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury.

In this case, upon being asked during his testimony whether the Defendant was the man he alternatively addressed as "Daddy Pat" and "Pat," the child victim said he could not remember. He explained that "Daddy Pat" had facial hair whereas the Defendant did not have facial hair at trial. The Defendant acknowledged during his testimony that he had facial hair during the period in which he and E.D. lived with the Enoses. During cross-examination, the victim elaborated that the Defendant looked "a little bit younger when [he] first met [the Defendant]." Significantly, E.D. pointed at the Defendant at three different points throughout his testimony when referring to the man he knew as "Pat." In summary, the lapse in time and resulting change in the Defendant's appearance does much to explain the victim's hesitance to identify the Defendant. As we explain below, any shortcoming in the victim's identification of the Defendant does not defeat the enormous weight of the evidence implicating the Defendant as E.D.'s abuser.

The proof at trial showed that E.D.'s mother brought E.D. to live with the Defendant,

35

whose first name is Patrick, and that E.D. addressed the Defendant as "Daddy Pat" because his mother told E.D. that the Defendant was his father. The Enoses confirmed E.D. and the Defendant lived with them in March 2007. The Defendant confirmed several innocuous details of E.D.'s account of his stay with the Defendant, such as the fact that he played computer games with E.D.; that he occasionally required E.D. to run around outside; and that he and E.D. visited the Williamses' home. Furthermore, the Defendant's DNA along with that of the victim was present on wadded up paper towels found underneath the Defendant's bed. Finally, the Defendant acknowledged the victim was in his care during the four to five days preceding Dr. Patel's examination of the victim. No serious controversy exists, therefore, as to whether the Defendant is the man whom E.D. knew as "Daddy Pat" and who E.D. testified harmed him in numerous ways. We conclude that the victim's partial recognition of the Defendant along with the body of evidence establishing the Defendant as the man E.D. addressed as "Daddy Pat" are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *Reid*, 91 S.W.3d at 277. He is not entitled to relief on this issue.

### 3. Efforts to Treat the Victim's Injuries

The Defendant asserts that, because he testified that, upon seeing the injuries to the victim's mouth, he treated the victim's mouth with chloroseptic and hydrogen peroxide, he should hot have been found guilty of aggravated child neglect.

A person commits aggravated child neglect who knowingly neglects a child less than eighteen years of age so as to adversely affect the child's health and welfare, and the act of neglect was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim. Tenn. Code. Ann. §§ 39-15-401(b), 402(a)(4) (2006). The record establishes through E.D.'s testimony and through that of several medical experts that the Defendant caused extensive blistering to the victim's mouth and severe bruising to the victim's groin area by pouring hot sauce into E.D.'s mouth and by squeezing and pulling on E.D.'s penis, respectively. Even crediting the Defendant's testimony that he applied chloroseptic and hydrogen peroxide to the victim's mouth, the record establishes that the Defendant failed to seek further treatment for the sores on the victim's mouth and wholly neglected to seek treatment for the groin-area bruising. The record sufficiently supports the jury's conclusion that the Defendant, through cruel, tortuous means, neglected E.D.'s well being in a way that adversely affected E.D.'s health and welfare. *See* T.C.A. §§ 39-15-401(b); 39-15-402(a)(4). The evidence sufficiently supports the Defendant's conviction for aggravated child abuse. He is not entitled to relief on this issue.

### 4. Testimony that a Bike Wreck Caused the Injuries Underlying the Aggravated Child Abuse Charge

The Defendant argues that the evidence was insufficient to support his conviction for aggravated child abuse because the victim originally did not claim to have been abused, the Defendant testified he saw E.D. wreck a bike he rode at the Williamses' house, and two medical experts acknowledged a bike wreck could have caused E.D.'s groin injuries.

At trial, E.D. testified that the Defendant squeezed and pulled his penis. E.D. may initially have withheld this information from medical personnel, but the physicians who examined him testified that his bruising was far more likely the result of trauma at the hands of another party than from a bike wreck. Though he referenced having wrecked his bike before in his young life, the victim never testified that he fell from a bike while staying with the Enoses, and Michael Williams confirmed that the victim never fell from a bike while playing at his house. Though medical experts indeed testified that a bike wreck "could" have caused the Defendant's groin injuries, the essence of their testimony was that a bike wreck was an extremely unlikely explanation of the groin injuries and that trauma was a far more likely explanation. Viewed in the light most favorable to the State, the evidence shows that the Defendant forcefully squeezed and pulled on the victim's penis, which caused extensive bruising and irritation on and around his penis. *See Goodwin*, 143 S .W.3d at 775.

The evidence that the Defendant poured hot sauce and pepper in the victim's mouth further supports the aggravated child abuse charge against the Defendant. This caused ulceration and irritation of the tissue both inside and outside the victim's mouth. This condition caused the victim significant pain and discomfort. In sum, "any rational trier of fact could have found the essential elements" of aggravated child abuse beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. at 319. The Defendant is not entitled to relief on this issue.

### 5. Victim's Lack of Early Disclosure of Abuse and "Erratic" Trial Testimony

The Defendant argues that the child victim's "erratic" and "nonsensical" testimony undermines the credibility of his allegations against the Defendant. As discussed above, questions of credibility of witnesses are left to the jury. The jury credited the victim's testimony, and on appeal we cannot second-guess its conclusions regarding E.D.'s credibility. *Bland*, 958 S.W.2d at 659. *Also see State v. Chester Floyd Cole*, No. W2001-02871-CCA-R3-CD, 2002 WL 31895730, *3 (Tenn. Crim. App., at Jackson, Dec. 31, 2002) (affirming convictions where child rape victim's testimony contained contradiction), *perm. app. denied* (Tenn. May 19, 2002). Though the child victim's testimony contains some apparent contradictions and also shows that the victim does not yet clearly understand the lengths of months and years relative to one another, his testimony paints a clear picture: The victim's mother handed him off to the Defendant, telling him the Defendant was his father, and the victim lived with this individual, whom he knew as "Daddy Pat," for at least two weeks.

During this time period, the Defendant sexually and physically abused the victim, whom he believed to be his son.

The offense of rape of a child, as relevant to this case, is defined as "the unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13)." T.C.A. § 39-13-522(a) (2006).

A conviction for criminal attempt, as relevant to this case, requires proof that the defendant "intentionally engage[d] in action or cause[d] a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believe[d] them to be." T.C.A. § 39-12-101(a)(1) (2006). Incest, as relevant to this case, is defined by statute as "the sexual penetration . . . with a person, knowing the person to be . . . the person's . . . child." T.C.A. § 39-15-302(a)(1). Incest is not a lesser-included offense of rape. *State v. Brittman*, 639 S.W.2d 652, 654 (Tenn. 1982).

The evidence presented at trial of what transpired during the short time E.D., who was five years old at the time, lived with the Defendant more than supports the Defendant's convictions for rape of a child and attempted incest. Viewed in the light most favorable to the State, the evidence shows that the Defendant blindfolded the victim and placed his penis in the victim's mouth, telling the victim his penis was a bar of soap. After moving his penis around inside the victim's mouth, the Defendant either ejaculated or urinated in the victim's mouth. A paper towel found under the victim's bed contained both the victim's DNA and the Defendant's sperm. Based on these facts, any rational trier could have found the essential elements of rape of a child beyond a reasonable doubt. *See State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992). Further, because the record clearly establishes that, at the time of this conduct, the Defendant believed E.D. was his son, any rational trier of fact could have found the essential elements of attempted incest. *See Id*. The Defendant is not entitled to relief on this issue.

### D. Sentencing

On appeal, the Defendant contends that his sentence is improper because: the trial court unconstitutionally enhanced his sentence based upon factors it, and not a jury, found to exist; the trial court improperly applied enhancement factor (7) to his convictions for aggravated child abuse, aggravated child neglect, sexual exploitation of a minor, and attempted incest; the trial court improperly applied enhancement factor (12) to his convictions for aggravated child abuse, aggravated child neglect, and attempted incest; and the trial court improperly found that the Defendant was a "dangerous offender" and imposed consecutive sentencing.

## 1. Length of Sentence

The Criminal Sentencing Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2) and (d) (2006); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). The Tennessee Code allows a sentencing court to consider the following enhancement factors, among others, when determining whether to enhance a defendant's sentence:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;
. . .

(5) The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense;

(6) The personal injuries inflicted upon, or the amount of damage sustained by or taken from, the victim was particularly great;

(7) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement;

(8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;
. . .

(12) During the commission of the felony, the defendant intentionally inflicted serious bodily injury upon another person, or the actions of the defendant resulted in the death of, or serious bodily injury to, a victim or a person other than the intended victim;

(14) The defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense;

T.C.A. § 40-35-114(1), (5), (6), (7), (8), (12) and (14) (2009). If an enhancement is not already an essential element of the offense and is appropriate for the offense, then a court may consider the enhancement factor in its length of sentence determination. T.C.A. §

39

40-35-114 (2006).  In order to ensure "fair and consistent sentencing," the trial court must "place on the record" what, if any, enhancement and mitigating factors it considered as well as its "reasons for the sentence."  T.C.A. § 40-35-210(e).  Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors it found to apply to the defendant.  T.C.A. § 40-35-401(b)(2) (2003).  The 2005 amendments deleted as grounds for appeal, however, a claim that the trial court did not properly weigh the enhancement and mitigating factors.  *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9.  In summary, although this Court cannot review a trial court's weighing of enhancement factors, we can review the trial court's application of those enhancement factors.  T.C.A. § 40-35-401(d) (2006); *Carter*, 254 S.W.3d at 343.

### a. Constitutionality of 2005 Sentencing Statute Under *Blakely*

The Defendant's first contention is that he was sentenced in violation of *Blakely v. Washington* because the trial judge, pursuant to Tennessee sentencing law, altered the Defendant's sentence upon finding that several enhancement factors applied to the Defendant's case.  542 U.S. 296 (2004).  *Blakely* held that sentencing schemes that allow a judge to alter a defendant's sentence based upon judge-found enhancement factors are unconstitutional.  *Id*.  In response to *Blakely*, many states amended their sentencing code to comply with *Blakely,* including Tennessee, which amended the 1989 Sentencing Act in 2005 to comply with *Blakely*.  *See* 2005 Tenn. Pub. Acts, ch. 353, § 5.  The amended acts provide that the court shall set a sentence within the range, that the court consider that the minimum sentence should be imposed, and that the length should be adjusted as appropriate for any enhancement and mitigating factors.  T.C.A. § 40-35-210(c).  The court "shall consider, but is not bound by" certain "advisory sentencing guidelines," which include that the sentence should be adjusted, as appropriate, for any enhancement or mitigating factors shown.  T.C.A. § 40-35-210(c)(2).

The Defendant committed the crimes in this case in 2007, well after the 2005 amendments to the Sentencing Act went into effect.  Thus, he was properly sentenced under the 2005 Sentencing Act, which allows the trial judge to adjust the Defendant's sentence based upon applicable enhancement and mitigating factors.  *See* T.C.A. § 40-35-210(c)(2).  The trial court, therefore, did not err solely by virtue of the fact that it enhanced the Defendant's sentence based upon several enhancement factors it found to apply.  The Defendant is not entitled to relief on this issue.

### b. Application of Enhancement Factors

The trial court in this case applied enhancement factors (1), (5), (6), (7), (8), (12), and (14) to enhance the Defendant's sentences.  The Defendant objects only to the trial court's

application of factors (7) and (12).

The Defendant is a Range I offender. Aggravated child rape, aggravated child neglect, and rape of a child are all Class A felonies. T.C.A. § 39-15-402(b), T.C.A. § 39-13-522(b). The sentencing range for a Range I, standard offender convicted of a Class A felony is fifteen to twenty-five years. T.C.A. § 40-35-112(a)(1). Sexual exploitation of a minor and attempted incest are both Class D felonies. T.C.A. § 39-17-1003; T.C.A. § 39-15-302. The sentencing range for a Range I, standard offender convicted of a Class D felony is two to four years. T.C.A. § 39-13-102(d)(1).

At the conclusion of the sentencing hearing, the trial court explained that it found enhancement factors (1), (5), (6), (7), (8), (12), and (14) applied to the Defendant's convictions, and it sentenced the Defendant to seventeen years for his aggravated child abuse conviction, seventeen years for his aggravated child neglect conviction, twenty-five years for his rape of a child conviction, four years for his attempted incest conviction, and four years for his sexual exploitation of a minor conviction. We address the applicability of enhancement factor (7) and (12) only because the Defendant directs his objections to these factors alone.

### i. Enhancement Factor (7)

The Defendant argues the trial court erroneously applied enhancement factor (7) to his convictions because the court did not explain why it "used this enhancement factor as a basis for increased sentences beyond the presumptive minimum." Enhancement factor (7) applies where the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement. T.C.A. § 40-35-114(7). The trial court explained that it found enhancement factor (7) applied to each of the Defendant's convictions because the court could conceive of no motive other than sexual gratification for the Defendant's actions:

> [Defense counsel] argues that [enhancement factor (7)] is a necessary part of or part of the element of the offenses.
>
> I don't know that I necessarily agree with that.
>
> I believe I am going to find from the proof in this case that the only logical conclusion is, whether you call it pleasure or call it excitement, either way, there is in other [sic] logical motive you could derive from the facts in this case other than enhancing factor number 7 would apply.

41

I don't believe that that is part of the element–you said–the defense argues it is implicit in the exploitation of a minor. I don't really believe that to be true that it is implicit. I think it would to be more specific[] part of the offense before it could be said to be included in that or is a necessary part. So I think it applies to [sexual exploitation of a minor] also.

The record contained adequate evidence of the Defendant's predilection for pornography. He himself testified that he downloaded pornography onto the computer in his room in the Enoses' house and that he occasionally masturbated in front of this computer. Officers located a large amount of sexually explicit material in the Defendant's bedroom, including a picture of a woman performing fellatio and wearing a studded collar. The Defendant both forced the victim to wear such a studded collar and also beat the victim with the studded collar. The record is replete with evidence that the Defendant completed his crimes against the victim for his sexual gratification. The trial court did not err when it applied enhancement factor (7). *Carter*, 254 S.W.3d at 343. Further, we cannot disturb the trial court's weighing of this enhancement factor and subsequent adjustment of the Defendant's sentence based upon this factor. T.C.A. § 40-35-401(d) (2006); *Carter*, 254 S.W.3d at 343. The Defendant is not entitled to relief on this issue.

### ii. Enhancement Factor (12)

The Defendant argues that the trial court erred when it applied enhancement factor (12) to the Defendant's convictions for aggravated child neglect, aggravated child abuse, and attempted incest. His apparent complaint is that the trial court "went into brief explanation as to why he was applying this enhancement factor [] to counts 1, 2, and 5 describing and comparing the facts of this case to torturing people by beating their feet . . . ." Enhancement factor (12) applies where the defendant's actions resulted in serious bodily injury. T.C.A. § 40-35-114(12).

The trial court explained that, because it believed the injuries to the victim's groin and buttocks necessarily caused "extreme physical pain," enhancement factor (12) applied to the Defendant's convictions for aggravated child abuse, aggravated child neglect, and attempted incest:

I do find that [enhancement factor (12)] applies. Does not apply to the sexual exploitation, that being child pornography. But I do find that it applies to 1, 2, and 5. You might keep in mind the definition of serious bodily injury includes extreme physical pain.

Without even going further in the definition of extreme physical pain,

42

I would draw everybody's attention to the exhibits of the child's genitals and note the conduct or note the publicity about torture about beating people on the bottom of their feet being torture there is no way anybody could in my mind could conceivably say that the shape, the condition of the victim child's genitals was such that he did not suffer great physical pain of torture resulting from torture by the [D]efendant.

So I do find that number 12 applies.

As the trial court correctly noted, the definition of serious bodily injury includes "extreme physical pain." T.C.A. § 39-11-106(a).

The record more than establishes that the Defendant caused the victim extreme physical pain. By squeezing and pulling on the victim's penis, the Defendant caused severe bruising and chaffing on and around the victim's penis. Other bruises were apparent on the victims back and buttocks. The Defendant also caused the inside of the victim's mouth to blister and the outside of his mouth to chaff and redden by pouring hot sauce and pepper into the victim's mouth. Further, by either ejaculating or urinating into the victim's mouth, the Defendant likely caused infection to set up inside the victim's mouth around the sores the Defendant had left untreated. The victim received extensive medical treatment after being removed from the Enos household, and he continued to undergo psychotherapy as of the date of sentencing, two years after the events in this case. These injuries provide ample basis to conclude the victim experienced extreme physical pain as a result of the Defendant's acts. *See* T.C.A. § 39-11-106(a). We cannot agree, as the Defendant suggests, that the trial court based its application of this factor solely on a case that applied this factor where a victim's feet were beaten. The trial court properly applied enhancement factor (12) to the Defendant's convictions for aggravated child neglect, aggravated child abuse, and attempted incest. Further, we conclude that the Defendant's sentences of seventeen, twenty-five, and four years are consistent with the principles of 2005 Sentencing Act. T.C.A. § 40-35-210(c)(2) and (d) (2006); *see Carter*, 254 S.W.3d at 343. He is not entitled to relief on this issue.

## 2. Alignment of Sentences

The Defendant contends the trial court erred in finding that he was a "dangerous offender" and imposing consecutive sentencing on that basis. See T.C.A. § 40-35-115(4) (2006). The State responds that, although the trial court indeed erred when it found the Defendant to be a dangerous offender, the court found two alternative bases for imposing consecutive sentencing, which support its decision.

If an offender meets one or more statutory criteria in Tennessee Code Annotated

43

section 40-35-115, whether or not he should be sentenced consecutively or concurrently is within the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn.Crim.App.1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the following seven factors exists:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b)(1)-(7). These criteria are stated in the alternative; therefore, only one need exist in order to impose consecutive sentencing.

In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn.2002).

After it set the length of the Defendant's sentences, the trial court found that three of the seven consecutive sentencing criteria applied to the Defendant's case. First, it explained that the Defendant's long history of drug use, his probation violations, and his misdemeanor convictions supported application of consecutive sentencing factor (2), that his record of criminal activity is extensive. The trial court also then explained that consecutive sentencing factor (6) applied because the Defendant was on probation at the time he committed the offenses against E.D. The Defendant does not contest the applicability of either of these factors, and we see no error in the trial court's application thereof.

The Defendant does, however, object to the court's application of a third consecutive sentencing factor, factor (4), that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. T.C.A. § 40-35-115(b)(4). The trial court explained this factor applied because the Defendant disregarded the risk of causing internal bleeding or permanent injury when he struck the victim with a belt and when he forcefully squeezed and pulled the Defendant's penis:

> I also find that number 4 applies . . . .
>
> In making this finding, I return again to the picture of the victim's genitals, which I think even a lay person could find that the risk of internal bleeding perhaps or permanent injury that would be associated with a visible injury of that nature would be something where either the risk to human life was high or at least his behavior in creating that condition evinces little or no regard for human life and the risk to human life is great.
>
> The injury certainly is visible and certainly that kind of injury would carry with it more injuries than meet[] the eye of a physical nature.

The trial court, therefore, based its order of consecutive sentencing on factors (2), (4), and (6). *See* T.C.A. § 40-35-115(4). It ordered the Defendant's two sentences for aggravated child abuse and aggravated child neglect and his sentence for sexual exploitation of a minor to be served concurrently to one another but consecutively to his sentences for rape of a child and attempted incest, which were to be served concurrently to one another. Thus, the trial court imposed a total, effective sentence of forty-three years.

The Defendant challenges only the trial court's finding that he is a dangerous offender, not its findings that he had a lengthy record of criminal activity or that he was on probation at the time of the offenses. As we find no error in the trial court's application of the two latter criteria, two valid alternative bases for consecutive sentencing exist. The

existence of any one of the seven criteria of Tennessee Code Annotated section 40-35-115(b) is sufficient to justify the imposition of consecutive sentencing. *State v. Alder*, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001). Consequently, we need not determine whether the trial court's determination that the Defendant is a dangerous offender was proper. T.C.A. § 40-35-115(b). The trial court properly imposed consecutive sentencing based not only upon the Defendant's lengthy record of criminal activity but also the fact that he committed offenses against E.D. while on probation for another offense. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and applicable law, we conclude that the Defendant waived review of the trial court's denial of his motion for judgment of acquittal; that the trial court properly instructed the jury; that the evidence sufficiently supports the Defendant's convictions; and that the trial court properly sentenced the Defendant. As such, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE